IN THE MATTER OF SHELDON M. LIEBOWITZ, AN ATTORNEY AT LAW.

December 18, 1985.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that SHELDON M. LIEBOWITZ, of ENGLEWOOD, who was admitted to the Bar of this State in 1949, be publicly reprimanded for his violation of *DR* 1–102(A)(5), conduct prejudicial to the administration of justice,

and *DR* 1–102(A)(6), conduct adversely reflecting on his fitness to practice law, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are adopted and respondent be and hereby is publicly reprimanded; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said SHELDON M. LIEBOWITZ as an attorney at law of the State of New Jersey; and it is further

ORDERED that SHELDON M. LIEBOWITZ reimburse the Ethics Financial Committee for appropriate administrative costs.

### Decision and Recommendation of the Disciplinary Review Board

This matter is before the Board based upon a report filed by a Special Master assigned by the Office of Attorney Ethics to hear this case. The Board makes the following findings of fact:

On February 24, 1983 Respondent's law firm was assigned by the Superior Court to represent a female client under a court program to provide counsel for indigent matrimonial clients. This woman was involved in custody litigation with her former husband. Respondent assigned one of his associates to handle the case. The client, however, canceled her initial appointment. It was rescheduled for March 1, 1983, the day before the scheduled hearing. The client arrived at Respondent's office late in the afternoon of a rainy day.

Respondent met briefly with the client at 6:30 p.m. She informed him she was there as an assigned client. She had no papers with her relating to the court proceeding. Respondent advised the client that he would not be able to handle her matter personally since he was otherwise engaged but an associate would appear with her at the hearing. Respondent told the woman that he was about to have dinner with clients

and another attorney at a nearby Chinese restaurant. She accepted Respondent's invitation to join them. Respondent drove the client to the restaurant in his car. Neither the client nor Respondent drank any alcoholic beverages during dinner. After dinner, Respondent offered to drive the client home or to his apartment where he said he had to make some telephone calls and they could have some drinks. The client believed this would give her an opportunity to discuss her custody case. However, Respondent contended that since he would not be representing her, he felt that his invitation to his apartment was purely social in nature. He believed he had no professional lawyer-client relationship with her. Respondent maintained that he felt that his responsibility ended once he had assigned the case to an associate.

In Respondent's apartment the client consumed a small amount of vodka and acquiesced to Respondent's request that she enter his bedroom and sit on the bed next to him while he made business telephone calls. Respondent then suggested that they commence sexual activity. When he unbuttoned the top front of her dress, she verbally resisted and pushed his hand away. Respondent kissed her on the lips. The client said, "I think I had better go." She buttoned her dress. Respondent removed his clothing, climbed into bed and urged her to join him there. The client reiterated that she had better leave.

When she returned to the living room, Respondent, completely nude, followed her urging her to return to the bedroom. He gently pulled her back into that room and onto the bed. During the course of this incident, Respondent touched her intimate parts and placed her hand on his genital area to assist his sexual self gratification. The client insisted on leaving. Respondent told her he would either drive her home or she could telephone for a taxicab at his expense. She telephoned for a cab and left the apartment.

The next morning, at the conclusion of her custody matter, she told Respondent's associate of his sexual advances. Later that

same day, March 2, the client gave a written statement to the county prosecutor's office. Respondent was charged with criminal sexual contact and attempted sexual assault. A Bergen County grand jury no-billed these indictable charges.

Respondent was then tried on April 9 through April 12, 1984 on a disorderly persons offense of lewdness. The trial judge found Respondent not guilty, ruling that the State had failed to prove beyond a reasonable doubt that the client was a nonconsenting observer. The trial judge referred the matter to the Ethics Committee.

On September 10, 1984 the Office of Attorney Ethics filed a complaint against Respondent. The complaint charged that Respondent's conduct was prejudicial to the administration of justice, DR 1–102(A)(5), adversely reflected on his fitness to practice law, DR 1–102(A)(6); that the exercise of his professional judgment on behalf of his client reasonably could have been affected by his personal interests, DR 5–101(A), and that during the course of the professional relationship Respondent knowingly damaged his client emotionally at a time when he should have known she was particularly vulnerable, DR 7–101(A)(3). In his answer, Respondent maintained that anything that occurred in his apartment was with the consent of the client.

At the time of the incident Respondent was 58 years of age and unmarried. He has been a member of the Bar since 1949. The client was 32 years of age.

The Special Ethics Master found as a fact the client's attitude throughout the incident was one of "concerned and reluctant acquiescence." He further found that Respondent had sexual contact with the client. The Special Ethics Master dismissed charges of violating DR 5–101(A) and DR 7–101(A)(3). The Special Ethics Master found that the client

> was emotionally involved in a custody fight relating to her children. Not unreasonably she relied on appropriate professional treatment by an attorney assigned to her as an indigent by the Court to represent her on a *pro bono* basis.

> Her perspective as to the attorney's role and position must be considered. He was obviously in a superior position as her assigned attorney and at least to her or someone in her position there was an inherent element of coercion in his conduct towards her.
>
> Thus she cannot be said to have truly consented to [Respondent's] sexual advances. That such inherent coercion was present is clear from the evidence, including her resistance to such advances [1T 31–10 to 1T 32–1].*

The Special Ethics Master concluded that the evidence clearly and convincingly demonstrated that Respondent violated *DR* 1–102(A)(5) and (6). He stated he was convinced that Respondent "generally has been affected by and learned something from the prior criminal proceedings as well as this Ethics matter." The Master further found that

> sexual episodes with clients jeopardize the attorney client relationship and have a strong potential to involve the attorney in a breach of one or more Disciplinary Rules [1T 36–13 to 19].

The Special Ethics Master concluded that Respondent's transgression was an aberration and that Respondent was not cognizant of the seriousness of his misconduct. The Master was satisfied that this conduct would not be repeated. He recommended that Respondent be publicly reprimanded, stating that

> [p]ublic censure presumably will make the public aware of the seriousness with which the Supreme Court views the kind of ethical violations here involved. It may also serve as a deterrent to other attorneys who may not be fully aware of their professional responsibilities to assigned or *pro bono* clients and the ethical problems inherent in the sexual involvement with them.
>
> As far as [Respondent] himself is concerned I believe that a private reprimand would have the necessary deterrent effect.
>
> But in view of the nature of the offense, a sexual episode involving a *pro bono* court assigned client, on balance I recommend a public reprimand with a warning that any repetition of this kind of conduct will result in sterner disciplinary sanctions. [1T 39–4 to 21].

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Special Ethics Master in finding unethical

---

* 1T refers to the hearing transcript of the Special Ethics Master of January 10, 1985.

conduct on the part of Respondent are fully supported by clear and convincing evidence.

The Board finds that the attorney-client relationship between Respondent and his female client began when she entered his office as a court assigned client. This attorney-client relationship must be viewed from the perspective of a lay person. The Board rejects Respondent's contention that this professional relationship came to an end when he assigned the case to an associate. Respondent, a named partner in the firm assigned to represent her, was the only attorney with whom she had direct communication. Despite his stated delegation of her case, her assumption that he was her attorney was natural and is controlling.

The gravamen of the offense is the opportunistic misconduct toward his *pro bono* client. The Board adopts the conclusion of the Special Ethics Master when he said that where an indigent matrimonial

client has been assigned by the Court both she and the Court may reasonably expect and rely on the fact that she will be treated strictly on a professional basis by the assigned attorney and not be converted into or considered by the attorney as a social guest to whom sexual proposals may be made and with whom sexual conduct may take place [1T 33–4 to 12].

Respondent was in a position of superiority or dominance. An assigned client could reasonably infer that a failure to accede to Respondent's desires would adversely impact on her legal representation.

The standard of conduct demanded of a member of the Bar must be objective. *In re Makowski,* 73 *N.J.* 265, 270 (1977). Respondent's conduct must be examined from the viewpoint of an informed and concerned private citizen and be judged by whether the reputation of the Bar would be lowered if the conduct were permitted. *In re Opinion No. 415,* 81 *N.J.* 318, 325 (1979). Based on the facts of this case the Board concludes that Respondent violated *DR* 1–102(A)(5) by engaging in conduct that was prejudicial to the administration of justice. By taking sexual advantage of an assigned client, Respondent

brought the *pro bono* matrimonial counsel program into disrepute.

In determining what discipline to recommend, the Board is mindful that the purpose of discipline is to protect the public from the attorney who does not meet the standards of responsibility of every member of the profession. *In re Goldstaub*, 90 *N.J.* 1, 5 (1982). Mitigating factors are relevant. *In re Hughes*, 90 *N.J.* 32, 36 (1982).

Respondent has been a member of the Bar since 1949. He has no prior disciplinary record. As a result of these ethics proceedings, Respondent is now fully aware of the seriousness of his conduct. He has discontinued his practice of socializing with clients. The record contains proof of Respondent's good character as an attorney and person. A six-member Board majority found that these mitigating factors outweighed the aggravating factor of Respondent's misconduct and recommend that Respondent be publicly reprimanded. One member voted for a one-month suspension from the practice of law. Two members did not participate.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.