739 A.2d 24

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Richard E. PAINTER.**

**Misc. (Subtitle AG) No. 25, Sept. Term, 1998.**

Court of Appeals of Maryland.

Oct. 13, 1999.

Melvin Hirshman, Bar Counsel and James P. Botluk, Assistant Bar Counsel for petitioner.

No argument on behalf of the respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

BELL, Chief Judge.

The Attorney Grievance Commission of Maryland, the petitioner, through Bar Counsel and pursuant to Maryland Rule 16–709,[1] filed a Petition for Disciplinary Action against Richard E. Painter, the respondent, alleging that the respondent engaged in misconduct involving domestic violence and abuse of his wife and children. More particularly, the petitioner charged that the respondent violated Rule 8.4[2] of the Maryland Rules of Professional Conduct, Maryland Rule 16–812, Appendix: Rules of Professional Conduct of the Maryland Rules.

We referred the matter to the Honorable Martha G. Kavanaugh of the Circuit Court for Montgomery County, to make findings of fact and draw conclusions of law pursuant to Maryland Rule 16–711(a).[3] Following a hearing, Judge Kavanaugh filed Findings of Fact and Conclusions of Law as follows:

"On December 7, 1998, a hearing was held before this court. Counsel for the Attorney Grievance Commission, James Botluk, was present and respondent, Richard E. Painter, was present, *pro se.* Two police officers and respondent testified. Without objection by respondent to any hearsay contained in the documents, the court received the following exhibits: 1)

---

1. Maryland Rule 16–709, as relevant, provides:
   "a. Who may file.—Charges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board."

2. As relevant, that Rule provides:
   "It is professional misconduct for a lawyer to:
   
   \* \* \* \*
   
   "(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   
   \* \* \* \*
   
   "(d) engage in conduct that is prejudicial to the administration of justice."

3. Maryland Rule 16–711(a) provides: "A written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

the police report and the docket entries in criminal case *State v. Painter,* (Montgomery County criminal case number C71368), and 2) the trial transcript of respondent's divorce case *Painter v. Painter,* (Montgomery County civil case no. 113985), and the resultant appellate decision *Painter v. Painter,* 113 Md.App. 504 [688 A.2d 479] (1997).

"On April 15, 1994, the Grand Jury for Montgomery County indicted respondent, on a twelve-count indictment alleging various degrees of domestic violence against his wife and children. The charges ranged from attempted murder to stalking. On December 19, 1994, respondent pled guilty to two counts of transporting a handgun and two counts of battery. The court disposed of the case under Article 27 § 641, placed respondent on five years supervised probation, and fined him $400.00. On March 31, 1997, the court found respondent in violation of probation, but declined to revoke his probation.

"On November 1995, respondent's divorce was tried in the Circuit Court for Montgomery County. On appeal, in *Painter v. Painter,* 113 Md.App. 504, 529 [688 A.2d 479] (1997) Judge Cathell wrote:

"Due to the seriousness of the problem of domestic violence in our society and the extreme example of domestic violence contained in this case, we commit this case to the reporter in order that the facts contained herein may be preserved as examples of the seriousness of this, all too frequent, recurring problem and to again emphasize that a woman is not required to be a homicide victim in order to establish the elements of constructive desertion."

## *"FACTS*

"The court, from the testimony and the exhibits, has determined the following facts by clear and convincing evidence. This narrative summarizes examples of respondent's acts of violence towards his wife and children from 1978 until 1994.

*"Spousal Abuse*

Linda Painter married respondent in 1978. Respondent was twenty-nine years older than Linda. They have two

children, Daniel (now 18) and Christina (now 13). From the time of their honeymoon, respondent was physically abusive to his wife.

"In 1991 respondent beat Linda's head against the garage floor and swung a hatchet at her. Daniel witnessed the incident during which his father called his mother "a goddamn, fucking bitch." Respondent got on top of Linda and pounded her head. As a result, Linda injured her back. When physically able, Linda and Daniel drove to her mother's home in Florida. Linda returned to the family home only after respondent promised to cease the violence towards her.

"Respondent, however, continued to verbally abuse and slap Linda. On May 10, 1993, Linda feared once again for her life. Respondent knocked her out of a chair, jumped on top of her and beat her. Linda ran outside whereupon respondent kicked her, cursed her, choked her, bashed her head, and pulled her hair. Her grown stepson pulled respondent off of her. Later, respondent told Linda that he planned to either commit suicide or kill her. At that time, respondent kept guns in his bedroom. Finally, Linda obtained a protective order from domestic violence, which allowed her to remain in the family home without the respondent. She hired a body-guard at $250.00 per day until her money ran out.

"On February 4, 1994, the police became involved with the Painter family violence. Linda called the Montgomery County Police Department, told them that her estranged husband, who had threatened to kill her, was armed and parked a few blocks away. Officer Mark Lee located the respondent and found a .38 Caliber Special and a .32 Smith and Wesson on his person. Both guns were loaded, and spare bullets were found in respondent's pockets. This police intervention lead to respondent's guilty pleas. His explanation to this Court was that his plan was to blow his brains out in front of his wife, so that she would always remember his suicide but that he had changed his mind before the encounter with Officer Lee.

"*Child Abuse*

"On New Year's Eve in 1990, respondent flew into a rage because his son, Daniel, hit the wrong switch and turned on a

fan. Respondent grabbed Daniel and beat his head against a wall. Respondent's wife, Linda, and his sister, Madge Adkins, attempted to assist Daniel, which resulted in respondent beating his wife and calling her a "stupid, fucking bitch." Other reported incidents of violence towards Daniel include respondent giving Daniel a black eye on Daniel's first birthday and other occasions of his grabbing Daniel, of his throwing Daniel against walls, and of his choking Daniel.

"Respondent was usually verbally abusive rather than physically abusive toward his daughter, Christina. Since the time Christina was a baby, respondent would call her a "fucking brat." When Christina was in the first grade, he said to her "you are nothing but a fucking, goddamn bitch, just like your mother." When Christina was five she accidentally messed up her father's hair. Respondent grabbed her around the neck, choked her, and shook her head back and forth. On another occasion when Christina was five, the respondent, with closed fist, slugged her in a restaurant because she wanted orange juice instead of her father's preference for milk. In addition, there was testimony that respondent beat and kicked Christina's dog. Once he threw the dog off the second story deck in front of his wife and daughter.

*"Respondent's Testimony*

"Respondent testified that he is a member of the District of Columbia and Maryland bars. He worked as a GS–11 for the Department of Justice and then joined a law firm in Upper Marlboro. He has held positions as an assistant county attorney, Deputy State's attorney, trial magistrate, and People's Court judge. In 1960, he returned to private practice. He voluntarily closed his law office in November 1993 due to his "mental state." His self-imposed exile from practicing law continues even though he has been a member in good standing of the Bar for forty-two years.

"Respondent admitted pleading guilty to the handgun and battery charges. He described his violation of probation as a brief incident in a parking lot, which he regarded as a techni-

cal violation at best. He repeatedly pointed out that there was no medical evidence of injuries to his wife and children throughout the entire period of his marriage. Respondent never denied, however, any of the incidents of domestic violence.

"He described his "mental condition" as depression. He testified that he committed himself to Montgomery General Hospital from February 4 to March 17, 1994, after the incident with the handguns. The police report notes, however, that it was in fact the police who obtained respondent's emergency admission to Montgomery General Hospital on an involuntary basis. In any event, respondent was transferred to Perry Point Veteran's Hospital where he was arrested. Respondent was under the care of a psychiatrist for a year and one-half. At the time of the hearing respondent was not receiving counseling nor taking medications. Respondent did not offer his psychiatric records to this Court.

### "Law

"In *Attorney Grievance Commission of Maryland v. Stanley E. Protokowicz, Jr.,* 329 Md. 252, 257 [619 A.2d 100] (1993), the respondent attorney admitted on appeal to his violation of Rules of Professional Conduct, Rule 8.4 (misconduct).[1] In *Protokowicz,* the Respondent was representing his long-time friend in his divorce case. Respondent had assisted his client in breaking into the client's estranged wife's home, in taking personal property and materials having evidentiary value in their divorce case and in killing the family cat in a microwave oven. Respondent pled guilty to two misdemeanors: breaking and entering a dwelling house and cruelty to animals. In mitigation, respondent was intoxicated at the time of his offenses. The Court said: "Respondent is guilty of serious misconduct.... This is outrageous behavior, a world apart from what this Court, the profession, and the public is entitled to expect from members of the bar[.] *Id.* at 261, 262 [619 A.2d 100]. The Court of Appeals found that the respondent's conduct was an "aberration" but nevertheless found "the egregious nature of that conduct warrants the imposition of a significant sanction." *Id.* at 263, 619 A.2d 100.

"In the instant case, there is clear and convincing evidence that respondent committed criminal acts, namely battery and transporting a handgun. He pled guilty and was fined $400.00. Therefore, there was a conviction within the meaning of Rules of Professional Conduct, Rule 16–710(e), notwithstanding the disposition under Article 27 § 641. Moreover, the exhibits contain facts that constitute serious criminal acts against respondent's wife and children. The question arises whether respondent's criminal conduct "reflects adversely ... on his fitness as a lawyer in other respects["] and/or "is prejudicial to the administration of justice." Rules of Professional Conduct, Rules 8.4(b) and (d).

"Respondent argues that there is no evidence of physical injuries to his family. However, the record contains many acts of physical violence, which fortunately did not necessitate emergency medical attention. Moreover, respondent ignores the mental toll his abusive actions have had on his family. In fact, the Honorable Paul A. McGuckian denied respondent visitation with his son, Daniel, because the domestic violence had caused serious mental problems for Daniel.[2]

"Respondent, at his hearing, asked this Court to analogize his behavior in light of President William Jefferson Clinton's. In other words, what happened behind closed doors has had no impact on his fitness as an attorney. It is clear from the record and from respondent's comments in court that he has no appreciation, no insight, nor explanation for the cycle of violence to which he subjected his family. Unlike respondent in *Protokowicz*, who engaged in an isolated incident, this respondent's criminal conduct spanned for a sixteen-year period."

---

[1] Respondent excepted to the findings of his violation of Rules of Professional Conduct, Rules 1.2(d) and 3.4."

[2] *See Painter v. Painter*, 113 Md.App. 504 (1997), 517–521 [688 A.2d 479], for full discussion of the emotional damage Daniel suffered as a result of his father's behavior."

*Id.* at nn. 1, 2.

■ Neither party took exceptions to the hearing court's findings of fact or conclusions of law. Consequently, the only

issue that this Court is required to decide is the appropriate sanction to be imposed for the violations.

The petitioner filed a recommendation for sanction, to which the respondent did not respond, in which it recommended that the respondent be disbarred. In support of that recommendation, the petitioner argues:

> "Respondent engaged in a course of violent, criminal conduct over a period of many years by physically and mentally abusing his then-wife and children. His spousal abuse began on his honeymoon and continued throughout the marriage. He struck and verbally abused his children when they were very young. Not even the family's dog was spared physical harm. Respondent used a hatchet during one attack on his wife. When he was arrested for stalking her, he had two loaded handguns with extra ammunition on his person."

*Protokowicz*, in which the Court imposed an indefinite suspension with the right to apply for reinstatement after one year, was distinguished from the instant case on the basis of the length of the time during which the misconduct occurred and its precipitating cause. In *Protokowicz*, the petitioner points out, the criminal conduct occurred on one night and after the respondent in that case had drunk a large amount of alcohol, while here, the conduct spanned some 16 years, unmitigated, so far as the record reveals, by alcohol addiction or mental illness. The petitioner further distinguishes *Protokowicz* by noting that there was no physical attack on any person involved in that case.

Finally, the petitioner relies on the respondent's past disciplinary history. The respondent, who was then a People's Court judge, was charged with assault with intent to kill, assault with intent to maim and assault and battery. It was alleged that he struck a close female acquaintance and threatened her with a revolver. The petitioner pled guilty to assault and battery, as result of which he received a private reprimand in 1970 and resigned his judgeship.

Rather than being related to his law practice, involving a client or directly implicating the traits so closely associated with the legal profession—honesty, trustworthiness, truthfulness and reliability, *see* ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) 5.11[4] (ABA Standards)—or fitness to practice law, the respondent's conduct consisted of abusing, physically, verbally, and psychologically, his wife and his children. In other words, what is involved in this case is domestic violence. We have not heretofore been presented with the question of the appropriate discipline when an attorney has engaged in such misconduct. Although spanking was involved, the misconduct in *Attorney Griev. Comm'n v. Goldsborough*, 330 Md. 342, 347–49, 624 A.2d 503, 505–506 (1993), which we characterized as sexual harassment and for which a sanction of indefinite suspension was imposed, *id.* at 364, 365, 624 A.2d at 514, occurred in the context of that respondent's law practice and involved his spanking a client and a former secretary and kissing another client.

We have recognized that domestic violence is a serious problem in our society. *Coburn v. Coburn*, 342 Md. 244, 251, 674 A.2d 951, 955–56(1996). So, too, has the Court of Special Appeals. In fact, in the respondent's domestic case, after making the observation, that court characterized the respondent's case as an "extreme example of domestic violence." Moreover, the General Assembly enacted legislation in 1980, now codified at Maryland Code (1984, 1999 Repl.Vol.) §§ 4–501 through 4–516.5 of the Family Law Article to address the

---

4. ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) 5.11 provides:

"5.11 Disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

"(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

problem. That statute, which provides for a wide variety and scope of available remedies designed to separate the parties and avoid future abuse, is intended "to protect and 'aid victims of domestic abuse by providing an immediate and effective' " remedy. *Barbee v. Barbee*, 311 Md. 620, 623, 537 A.2d 224, 225 (1988).

New Jersey, which also has a domestic violence statute and a strong public policy against domestic violence, *In the Matter of Principato*, 139 N.J. 456, 655 A.2d 920, 922–23 (1995), has had the occasion to discipline attorneys for acts of domestic violence. *Id.; In the Matter of Magid*, 139 N.J. 449, 655 A.2d 916 (1995). The sanction imposed in both cases was a public reprimand. In *Magid*, the respondent, the First Assistant Prosecutor of Glouchester County, pled guilty to assault of a girlfriend, "specifically by punching her in the head and face area causing a black eye, knocking her to the ground and kicking her in the neck, head, and lower back, causing other bruising," and received a sentence of one year probation, $250.00 fine and a $50.00 violent crime penalty. 655 A.2d at 917. The court noted that the assault conviction was an isolated incident on the respondent's otherwise unblemished professional record, that the assault was of short duration, the publicity surrounding the assault negatively and severely impacted the respondent's career, but was quick to point out that the mitigating factors "neither excuse the attack nor obviate the necessity for public discipline." *Id.* at 919. In *Principato*, the respondent was found guilty of assaulting a client, with whom he also had a social, intimate relationship. 655 A.2d at 921. The assault consisted of overturning a mattress on which the victim was seated, pinning her behind the mattress and "pummel[ing] her against the mattress, he never hit her skin directly, but he did pummel the mattress forcefully at least 10 or 15 times," for about 10 seconds. *Id.* The court rejected the recommendation of a private reprimand, notwithstanding mitigating factors. In both *Principato* and *Magid,* the Court made clear:

"But for the fact that we have not previously addressed the appropriate discipline to be imposed on an attorney who is

convicted of an act of domestic violence, and that respondent did not engage in a pattern of abusive behavior, respondent's discipline would be greater than the public reprimand we hereby impose. We caution members of the bar, however, that the Court in the future will ordinarily suspend an attorney who is convicted of an act of domestic violence"

*Principato,* 655 A.2d at 923; *Magid,* 655 A.2d at 919.

Consistent with ABA Standard 5.12,[5] suspension is the sanction imposed by most courts addressing the issue. *People v. Knight,* 883 P.2d 1055, 1056 (Colo.1994) (six month suspension for third degree assault on wife consisting of three days of severe beatings); *People v. Wallace,* 837 P.2d 1223, 1225 (Colo.1992) (three month suspension for multiple assaults on girlfriend); *In re Walker,* 597 N.E.2d 1271, 1272 (Ind.1992) (six month suspension for assault on former client/girlfriend and her daughter); *Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Patterson,* 369 N.W.2d 798, 801 (Iowa 1985) (three month suspension for severely beating girlfriend for two hours while her five year old son was at home and aware of the assault). Suspension for a year and a day was the sanction imposed in *People v. Musick,* 960 P.2d 89 (Colo.1998). There, the respondent attorney assaulted his girlfriend, with whom he lived, on three separate occasions. Noting that assault is *malum in se,* the Court stated that "[s]uch conduct on the part of an officer of the court is very serious indeed. The fact that the respondent's misconduct was not directly related to his practice of law is only one factor to be taken into account, but is not a determinative factor." *Id.* at 92. Reminiscent of *Goldsborough,* the Court required the respondent "to demonstrate that he has been rehabilitated and is once again fit to practice law before he may be reinstated." *Id.* at 93.

**5.** ABA Standard 5.12 Provides:

"5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice."

The cases in which the attorney has been disbarred involve aggravated assaults, coupled with other misconduct. Thus, in *In re Nevill,* 39 Cal.3d 729, 217 Cal.Rptr. 841, 704 P.2d 1332, 1339 (1985), the attorney was disbarred when convicted of the voluntary manslaughter—he shot her ten times—of his wife. The misconduct in *In re Runyon,* 491 N.E.2d 189, 190 (Ind. 1986) consisted of forced entry into the attorney's former wife's home, striking her with a club and holding her at gunpoint, as well as three felony convictions of possession of unregistered firearms. But see *In the Matter of Howard,* 143 N.J. 526, 673 A.2d 800, 804 (1996) (three month suspension for conviction of vehicular homicide of spouse).

■ It is patent, therefore, that an attorney's conduct in engaging in spousal abuse, domestic violence, is viewed by the courts addressing the issue as prejudicial to the administration of justice and maybe even as impacting adversely that attorney's fitness to practice law. *Committee on Prof'l Ethics & Conduct v. Patterson,* 369 N.W.2d 798 (Iowa 1985) is an example of the statement of the rationale. There, the Court held that it is a morally reprehensible crime to engage in domestic abuse assault. *Id.* at 801.

In addition to the pattern of misconduct, the acts of spousal abuse and child abuse that the hearing court found occurred, the respondent pled guilty to two counts of illegally transporting a handgun, pursuant to Maryland Code (1957, 1996 Repl. Vol.) Article 27 § 36B (b) and two counts of battery. Although misdemeanors, the handgun convictions and the battery convictions resemble the situation in *In re Runyon.* But more than that, as the petitioner notes and stresses, this is not the respondent's first encounter with the attorney discipline system and it is not the first time that he has been charged with, and found to have committed, violence on a female.[6] The

---

6. The sanction that the respondent received for that misconduct, a private reprimand, was somewhat less than that imposed in the case of *In the Matter of Disciplinary Proceedings Against Turco,* 137 Wash.2d 227, 970 P.2d 731 (1999). In that case, a Municipal Court Judge found to have pushed his wife to the ground at a public function and who had

prior incident also involved the use by the respondent of a gun. That he was a People's Court judge at the time of that occurrence is significant, as is the fact that the incident caused him to lose that judgeship.

In *Attorney Grievance Comm'n v. Post,* 350 Md. 85, 97, 710 A.2d 935, 941 (1998), this Court addressed what § 8.4(b) requires for violation:

"Rule 8.4(b) recognizes, by its reference to character traits, rather than enumerating specific crimes, that commission of some crimes evidence or demonstrate a character flaw that, were the person committing them applying for admission to the bar, would constitute a significant impediment, if not outright prohibition, to his or her admission or, having been admitted, could result in his or her disbarment. The rule identifies two such traits. In addition to those traits, however, it includes as a catchall object, 'fitness as a lawyer in other respects.' Since the Rule is specific in the requirement that the criminal act reflect adversely on the character traits or fitness as a lawyer, it follows that what the Rule contemplates is that the criminal act evidence another character trait, which, like honesty and trustworthiness, is relevant or critical to the practice of law."

On the other hand, " 'conduct prejudicial to the administration of justice,' delegates or confirms to the courts the power and duty to consider particular conduct of one who is an officer of the court, in relation to the privileges and duties of a public calling that specially invites complete trust and confidence." *Rheb v. Bar Ass'n of Baltimore City,* 186 Md. 200, 205, 46 A.2d 289, 291(1946). We have recognized, in that regard,

"that conduct that impacts on the image or the perception of the courts or the legal profession, *see Attorney Griev. Comm'n v. Alison,* 317 Md. 523, 536, 565 A.2d 660, 666 (1989) and that engenders disrespect for the courts and for

---

a history of insensitivity to domestic violence, was publicly censured, suspended from office without compensation and ordered to complete a domestic violence course prior to any further judicial activity. *Id.* at 744.

the legal profession may be prejudicial to the administration of justice. Lawyers are officers of the court and their conduct must be assessed in that light."

*Attorney Grievance Comm'n v. Richardson,* 350 Md. 354, 368, 712 A.2d 525, 532 (1998). *See Iowa Supreme Court Board of Professional Ethics and Conduct v. Polson,* 569 N.W.2d 612, 613–14 (Iowa 1997). In that case, the Court held that an attorney's convictions of contempt, because it defied the court's orders, prejudiced the administration of justice and reflected adversely on his fitness to practice law.

We agree with the hearing court that, under the circumstances, an attorney, an officer of the court, who has committed acts of violence, to some of which he pled guilty, on both his wife and children, contrary to the policy of this State, which abhors such acts, and violated court ordered probation, at the very least, "engage[s] in conduct that is prejudicial to the administration of justice." [7] Where that conduct is a repetition of past conduct and involves a conviction for conduct similar to that for which he previously has been sanctioned, the appropriate sanction to be imposed is disbarment. Inasmuch as the respondent is not presently practicing law, the order is effective immediately.

---

**7.** We observe, even though no exceptions have been taken to the hearing court's findings of fact or conclusions of law, that it is not all that clear that the criminal conduct in which the respondent engaged and to which he has pled guilty impacts his fitness to practice law. Thus, while

"Disobedience of a court order, whether as a legal representative or as a party, demonstrates a lapse of character and a disrespect for the legal system that directly relate to an attorney's fitness to practice law and serve as an officer of the court,"

*Attorney Griev. Comm'n v. Garland,* 345 Md. 383, 398, 692 A.2d 465, 472 (1997), quoting, with approval, *In re Kelley,* 52 Cal.3d 487, 276 Cal.Rptr. 375, 380, 801 P.2d 1126, 1131 (Cal.1990), not all violations of the law indicate a lack of fitness to practice law. As we pointed out in *Attorney Griev. Comm'n v. Post,* 350 Md. 85–99, 710 A.2d 935, 941 (1998), if the only basis for the court's conclusion that a particular violation of the law reflects adversely on an attorney's fitness as a lawyer is that failure to practice what one preaches undermines one's credibility as a provider of legal counsel, that is simply another way of saying that the administration of justice may be prejudiced.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST RICHARD ELMER PAINTER.*